Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/24/2020 08:07 AM CST

- 124 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

In re Interest of Ky'Ari J., a child
under 18 years of age.
State of Nebraska, appellee, v.
Kwamayne J., appellant.

___ N.W.2d ___

Filed November 17, 2020.    No. A-20-015.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.
2. **Juvenile Courts: Jurisdiction: Proof.** In order to obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of Neb. Rev. Stat. § 43-247 (Reissue 2016). The State must prove such allegations by a preponderance of the evidence.
3. **Juvenile Courts: Proof.** While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm.
4. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292 (Reissue 2016) provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child.
5. **Parental Rights.** Neb. Rev. Stat. § 43-292(9) (Reissue 2016) allows for terminating parental rights when the parent of the juvenile has subjected the juvenile or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse.
6. ____. Whether aggravated circumstances under Neb. Rev. Stat. § 43-292(9) (Reissue 2016) exist is determined on a case-by-case basis.
7. **Parental Rights: Words and Phrases.** Where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety, and welfare of the child, they are aggravated.

- 125 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

8. ____: ____. Aggravated circumstances exist when a child suffers severe, intentional physical abuse.

9. **Parental Rights: Proof.** Under Neb. Rev. Stat. § 43-292 (Reissue 2016), once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child.

10. **Constitutional Law: Parental Rights: Proof.** A parent's right to raise his or her child is constitutionally protected; as such, before a court may terminate parental rights, the State must also show that the parent is unfit.

11. **Parental Rights: Presumptions: Proof.** There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit.

12. **Parental Rights: Statutes: Words and Phrases.** The term "unfitness" is not expressly used in Neb. Rev. Stat. § 43-292 (Reissue 2016), but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests.

13. **Parental Rights: Words and Phrases.** Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being.

14. **Parental Rights.** The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other.

15. ____. A court need not wait for a disaster to strike before taking protective steps in the interests of a minor child.

Appeal from the Separate Juvenile Court of Douglas County: CHRISTOPHER E. KELLY, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Mary Rose Donahue for appellant.

Donald W. Kleine, Douglas County Attorney, Anthony M. Hernandez, and Katherine Corwin, Senior Certified Law Student, for appellee.

MOORE, Chief Judge, and BISHOP and WELCH, Judges.

Bishop, Judge.

## I. INTRODUCTION

Kwamayne J. appeals from the decision of the separate juvenile court of Douglas County terminating his parental rights to his daughter, Ky'Ari J. We affirm.

## II. BACKGROUND

### 1. Procedural Background

Kwamayne and Ashley T. are the parents of Ky'Ari, born in 2016. Ashley also has two other children, Brooklyn S., born in 2011, and Ky'Lynn J., born in 2019. Brooklyn's alleged father was not part of the juvenile proceedings below nor is he part of this appeal, and therefore, he will not be discussed any further. Although our record contains various statements that Kwamayne is Ky'Lynn's father, he is not listed on her birth certificate and there is no order establishing paternity appearing in our record. Moreover, on June 11, 2019, the juvenile court ordered Kwamayne to undergo paternity testing regarding Ky'Lynn "pursuant to his request," but our record does not reveal whether such testing took place or the results of any such testing.

Neither the adjudication of nor the parental rights to Brooklyn and Ky'Lynn are at issue in this appeal; they will therefore only be discussed as necessary. Furthermore, Ashley is not part of this appeal, and she will only be discussed as necessary. We note that during these same juvenile proceedings below, the State sought to adjudicate all three children as being within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) by reason of the fault or habits of Ashley and the State also sought to terminate Ashley's parental rights to all three children. Although the juvenile court did adjudicate all three children as being within the meaning of § 43-247(3)(a) by reason of the fault or habits of Ashley, the court found that the State had not met its burden of proof as to the termination of Ashley's parental rights to the children; therefore, her parental rights remained intact.

- 127 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

In May 2019, Kwamayne and Ashley were not married or living together, but they were in a relationship. On May 29, Kwamayne was watching Ky'Ari (then 3 years old), Brooklyn (then 7 years old), and Ky'Lynn (then 3 months old) at Ashley's apartment in Omaha, Nebraska, while Ashley was at work. While in Kwamayne's care, Ky'Lynn became unresponsive, and she was taken by ambulance to the University of Nebraska Medical Center (UNMC) emergency room. She was subsequently diagnosed with abusive head trauma. As a result, all three children were removed from the home and placed in the temporary custody of the Nebraska Department of Health and Human Services; they have remained out of the home ever since.

As relevant to this appeal, on May 30, 2019, the State filed a supplemental petition alleging that Ky'Ari was a child within the meaning of § 43-247(3)(a) by reason of the fault or habits of Kwamayne. The State alleged Ashley was the primary caregiver of Ky'Lynn; Ky'Lynn was transported to the UNMC emergency room due to being unresponsive; at UNMC, Ky'Lynn was diagnosed with injuries consistent with intentional physical abuse; Kwamayne was unable to provide a reasonable explanation for Ky'Lynn's injuries; Kwamayne failed to provide proper parental care, support, and/or supervision for the juveniles; and due to the above allegations, the juveniles were at risk for harm.

On September 3, 2019, the State filed an amended supplemental petition and termination of parental rights. The State once again alleged that Ky'Ari was a child within the meaning of § 43-247(3)(a) by reason of the fault or habits of Kwamayne. In support of its allegation, the State gave the same reasons noted in the May 30 supplemental petition, except that instead of alleging that Ashley was the primary caregiver of Ky'Lynn, the State now alleged the Kwamayne was a caregiver of Ky'Lynn. The State also sought to terminate Kwamayne's parental rights to Ky'Ari pursuant to Neb. Rev. Stat. § 43-292(2), (9), and (10)(d) (Reissue 2016). The State

- 128 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

alleged: Kwamayne substantially and continuously or repeatedly neglected and refused to give Ky'Ari, or a sibling of Ky'Ari, necessary care and protection; Kwamayne subjected Ky'Ari or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse; Kwamayne committed a felony assault that resulted in serious bodily injury to Ky'Ari or another minor child of the parent; and termination of Kwamayne's parental rights was in Ky'Ari's best interests. Finally, the State alleged that reasonable efforts were not required pursuant to Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2018).

## 2. Adjudication and
## Termination Hearing

The combined adjudication hearing and termination hearing was held on November 14 and December 2, 2019. Kwamayne was not present at the hearing on November 14, but his counsel was present that day. The court asked if Kwamayne's counsel had been able to have communication with Kwamayne. Counsel responded, "No," and then asked the court for a continuance so that Kwamayne could be present. However, the juvenile court informed counsel, "My bailiff advises that the sheriff told her that [Kwamayne, who was incarcerated at the time,] refused to be transported to the hearing and declines to attend." The court then overruled the motion to continue. Both Kwamayne and his counsel were present on December 2, the second day of the hearing.

Over the course of the 2-day hearing, several witnesses were called to testify and numerous exhibits were received into evidence. Kwamayne did not testify. A summary of the relevant evidence follows.

Dr. Suzanne Haney is board certified in child abuse pediatrics and is a child abuse pediatrician at Children's Hospital and Medical Center; she is also the medical director at a child advocacy center. Dr. Haney testified that she was called for a consult on Ky'Lynn at the pediatric intensive care unit (PICU) at UNMC on May 30, 2019. The day before, Ky'Lynn

- 129 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

was brought to UNMC "with an episode of unresponsiveness, and then eventually she went apneic or stopped breathing" in the emergency room. Dr. Haney said, "The studies showed that [Ky'Lynn] had a large left-sided subdural hematoma [(bleeding between the brain and the skull)] which required surgical intervention. And she had been to the operating room . . . and [a neurosurgeon] had drained that — the fluid off." To drain the fluid, the neurosurgeon initially placed a burr hole in Ky'Lynn's skull to relieve the pressure, but when it continued to bleed, he had to remove part of Ky'Lynn's skull so that he could repair the bleeding—later, he was able to put the section of the skull back and close it up. Ky'Lynn was then transferred to the PICU.

When Dr. Haney arrived at UNMC on May 30, 2019, she reviewed Ky'Lynn's medical records, including a CT scan as well as an MRI. According to Dr. Haney, it was clear that Ky'Lynn "didn't have any broken bones of her skull"; she confirmed that there was no skull fracture. Dr. Haney stated that the CT scan and MRI "showed the large left-sided subdural hematoma, as well as injury to the parenchyma of the brain [(the brain tissue)] itself." Dr. Haney reviewed documentation from the emergency room physician who had first seen Ky'Lynn and had spoken to Kwamayne to get a history of what happened. Dr. Haney stated:

> The information provided was that Ky'Lynn had been at home with [Kwamayne] on the 29th, and that she had been well in the morning and then later was observed to be coughing or choking on her bottle. [Kwamayne] patted her, put her back down, and then later found her to be less responsive.
>
>     He specifically denied any trauma and stated that he had asked the children if they had known of any falls, and . . . he said that they denied that.

Dr. Haney also reviewed information from the physician who did the history and physical in the PICU. According to Dr. Haney, the physician in the PICU also had the opportunity to

- 130 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

talk with Kwamayne and the history was similar: "Ky'Lynn had been well and then had choked on a bottle, that he had patted her and then later put her back down and then later she became less responsive." Dr. Haney's understanding was that Ashley was not present when Ky'Lynn became unresponsive.

In addition to reviewing information from the emergency room and the PICU physicians, Dr. Haney reviewed information from the ophthalmologist that examined Ky'Lynn. Dr. Haney stated that "Ky'Lynn had retinal hemorrhages noted in her left eye that were described as too numerous to count, out to the periphery and in multiple layers," so "she had intraretinal, which is within the layers of the retinal, and then subretinal hemorrhages, which is below the retina." Finally, Dr. Haney relied on the neurosurgeon's notes, which were described above. Dr. Haney also conducted her own examination of Ky'Lynn that week. Dr. Haney was not able to speak with Kwamayne and Ashley, so she provided specific questions to Det. Lisa Crouch of the Omaha Police Department to ask them because Dr. Haney wanted more details about what had happened, as well as any past medical history. Detective Crouch was able to provide information from Kwamayne and Ashley.

Dr. Haney diagnosed Ky'Lynn with abusive head trauma; she explained that trauma meant "[i]mpact or movement of the brain within the skull . . . ." Accidental trauma was ruled out because there was no history of trauma reported, plus Ky'Lynn was 3 months old and unable to harm herself. Dr. Haney continued that

> combined with the severity of the subdural, the location of the subdural, being that it was — not only covered the entire left side of the skull inside but then was in between both halves. And once the subdural was evacuated, we actually saw some on the right, too, which is not consistent with a single impact from a fall.
>
> So all of that together and then the information from ophthalmology, which was that — retinal hemorrhages.

- 131 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

Also the severity of those retinal hemorrhages is not consistent with any sort of a short household fall [(e.g., rolling off a changing table, being accidentally dropped by an adult, jumping out a second-story window)]. So that all together ruled out an accident.

Dr. Haney stated that a laboratory evaluation ruled out any sort of a bleeding disorder or infection. "So we were left with abuse — abusive head trauma as the only diagnosis." On cross-examination, Dr. Haney stated, "I've discussed this case with a number of the medical team, and nobody disagreed with my diagnosis"; the medical team was composed of "20 or 30" doctors, including physicians from neurosurgery and ophthalmology, the PICU physicians, physicians at Children's Hospital and Medical Center, and the "floor" pediatricians, "[s]o it's the whole hospital team" that cared for Ky'Lynn.

Dr. Haney testified that as a result of the brain injury, Ky'Lynn had "significant seizures requiring multiple medications and was transferred from [UNMC] to Children's [on May 31 or June 1, 2019,] because of the acuity of her condition and then, to my understanding, has required prolonged treatment for a neurologic injury." It was also Dr. Haney's understanding that Ky'Lynn has since been diagnosed with cerebral palsy, which she said can be caused by an injury such as Ky'Lynn's.

On cross-examination, Dr. Haney was asked, in her opinion, how Ky'Lynn's injuries occurred. Dr. Haney responded, "I don't know if she was thrown into something, if she was slammed on something, if she was shaken and slammed. I don't know because I wasn't there." However, Dr. Haney thought it was "very likely" that Ky'Lynn was shaken "and probably slammed, too," because "[s]he had unilateral injuries, and I see those more when there's also a significant impact." When asked how much force is necessary to cause a subdural hematoma, Dr. Haney responded, "[Y]ou can't test it to find out, but this is well beyond that seen in normal parenting."

- 132 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

Detective Crouch works in the special victims unit, specifically in the child victim/sexual assault unit. Detective Crouch testified that she was assigned to this case on May 29, 2019, after Ky'Lynn was brought into the UNMC emergency room with a brain injury. Detective Crouch went to UNMC and met with the emergency room physicians, who informed her that Ky'Lynn had a subdural hemorrhage.

Detective Crouch and another detective then spoke with Kwamayne and Ashley, individually, at UNMC on May 29, 2019. Detective Crouch described Ashley as "tearful, distraught, [and] concerned about her child" during the interview. However, Detective Crouch observed that Kwamayne was "[v]ery interested in what we were doing, concerned about the children being taken away," even though she never indicated that the children were being removed; it concerned her that this was his initial concern.

The recordings of Kwamayne's interview and Ashley's interview on May 29, 2019, were received into evidence. In Kwamayne's interview, he stated that Ashley had to work at 10 a.m. that day (May 29) and that she left the apartment at 9:48 a.m. He was at the apartment with all three girls and everything was good. About 12 or 12:30 p.m., he gave Ky'Lynn a bottle, changed her, and put her in her chair and she went to sleep. He went to check on the other girls, and when he came back, Ky'Lynn was coughing. Kwamayne was concerned. He took the bottle out of her mouth and patted her on the back, and she went back to sleep. Kwamayne said he put her back in the chair and everything was normal. He went to clean the kitchen, and then he heard Ky'Lynn coughing again, "like she's trying to catch her breath." He patted her back, she burped, and then she threw up. Ky'Lynn lay there, and Kwamayne thought she was asleep. When he came back a few minutes later to check on her, she was not moving and was not responding to his voice. Kwamayne said Ky'Lynn had a heartbeat and was breathing, but she was not moving and her body was "limp." He ran and got Brooklyn to help, and they got

- 133 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

some water; Kwamayne "sprinkled" some water on Ky'Lynn, and she made moaning noises. Kwamayne did not have a phone and Ashley had the car, so he asked Brooklyn to watch her sister and he ran to Ashley's work, which was a few blocks away, to get keys to the car. On the way back to the apartment with Ashley, he told her what happened. Ashley went to the apartment office and asked someone to call an ambulance, and then she returned to the apartment. Ashley's boss also showed up and asked if they should call the 911 emergency dispatch service, and Kwamayne said yes. The ambulance came and took Ky'Lynn to the emergency room. Kwamayne said that the doctor told him that Ky'Lynn had fluid on her brain. Kwamayne asked Brooklyn and Ky'Ari if they picked Ky'Lynn up; Brooklyn said that she did and that the baby hit her head on the couch—but Kwamayne was not sure if that happened the same day or the day before. Kwamayne said he did not hurt Ky'Lynn, "not even accidentally."

In Ashley's interview, she said that Kwamayne watched the girls when she had to work. She went to work (three to four blocks from the apartment) at 10 a.m. that day, May 29, 2019, and Ky'Lynn was fine. After about 2 hours, Kwamayne showed up and said that something was wrong with Ky'Lynn and that they needed to call 911. Ashley and Kwamayne drove home and found Ky'Lynn on the bed with her sisters standing over her. Brooklyn said Ky'Lynn "boo booed"; when asked, Brooklyn denied Kwamayne did anything to Ky'Lynn. Ashley ran to the apartment office and asked someone to call 911; when they were not moving fast enough, she asked the maintenance man outside to call too, and then the ambulance came. Ashley stated that the night before (May 28), Brooklyn told her that the day before (which would have been May 27), she was holding Ky'Lynn and hit her head on the edge of a seat; but Ashley stated that Ky'Lynn was fine "yesterday" (May 28).

Detective Crouch testified that Ky'Lynn and her siblings, Brooklyn and Ky'Ari, were possibly at risk of harm

- 134 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

in Kwamayne's and Ashley's custody, due to the fact that Ky'Lynn's significant brain injury was unexplained. She therefore authored an affidavit of removal of the juveniles from their parents. Detective Crouch then consulted with Dr. Haney.

On June 3, 2019, Detective Crouch and the other detective conducted second interviews with Kwamayne and Ashley, individually, at central police headquarters. According to Detective Crouch, during this second interview, Kwamayne was "[s]till very talkative, stated he wasn't sure what had happened to the baby." She stated that Kwamayne had "different theories on how [Ky'Lynn's injuries] possibly could have happened."

The recordings of Kwamayne's second interview and Ashley's second interview from June 3, 2019, were received into evidence. In his second interview, Kwamayne described the same series of events that led up to Ky'Lynn's hospitalization that he had described in his May 29 interview. He again mentioned that Ky'Lynn hit her head on the edge of the couch while Brooklyn was holding her. He also mentioned a car accident in which they were rear-ended, and this had happened a couple days prior to May 29; the police were not called because "no damage was done." According to Kwamayne, Ky'Lynn seemed "fine" after the car accident. During this interview, Kwamayne again denied doing anything to hurt Ky'Lynn.

In her second interview from June 3, 2019, Ashley relayed the same information that she had in her interview on May 29—when she left for work Ky'Lynn was fine and hours later Kwamayne ran to her work, saying something was wrong with Ky'Lynn. Ashley also told the detectives about the car accident, which she said occurred on the Sunday before May 29 (this would have been May 26), but said that Ky'Lynn was buckled in a five-point harness car seat at the time and was "fine" after the accident. Detective Crouch testified that she observed the vehicle and noted "very minimal, if any, damage to the rear."

Detective Crouch confirmed that she discussed the alternative scenarios with Dr. Haney, but neither lined up with

- 135 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

the injuries Ky'Lynn sustained. And during cross-examination, Dr. Haney said that the Omaha Police Department provided her with information about an older sibling dropping Ky'Lynn, but Dr. Haney stated "that's not going to be consistent with the child's injuries." Dr. Haney did not recall being aware of a report that the family had been in a car accident the week before, but said that information "wouldn't have changed anything," "[b]ecause clearly it was not a severe enough car accident to warrant any medical attention, and . . . it would not have caused this extent of injuries." According to Dr. Haney, with the severity of Ky'Lynn's injuries, symptoms would have appeared "[r]elatively quickly, within probably minutes to an hour," she would have been "noticeably unwell" as evidenced by "[n]ot responding, maybe significant vomiting, probably clinically deteriorating [(decreased responsiveness, moaning, maybe even seizing)]."

Also during her second interview on June 3, 2019, Ashley stated that she and Kwamayne have had arguments and disputes, including arguing about Ky'Lynn's paternity; Ashley stated that Kwamayne does not believe that Ky'Lynn is his daughter. When asked if things ever got physical, Ashley initially said no, but later admitted that it had gotten physical in the past, most recently about 2 weeks prior when they got into an altercation and Kwamayne got mad and threw a vase on the ground; Ashley did not indicate whether the children were present. When asked if Kwamayne ever put his hands on her in the past, Ashley admitted that it had been "a while" (the audio was unclear as to whether she said it had been a month, 2 months, or 3 months); she said Kwamayne pushed her, but she did not fall back. When asked if Ashley appeared fearful when talking about the domestic violence, Detective Crouch testified, "At times." She said Ashley "started to cry, and she — her head would go down. She would look down as I was speaking with her."

Detective Crouch testified that she had also located a report from within the year prior, in which Brooklyn made

- 136 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

a report at school that she had been physically harmed by Kwamayne; however, Kwamayne was never charged.

After concluding her investigation, and based on the medical opinions and the fact that Kwamayne was the caregiver at the time of the onset of Ky'Lynn's symptoms, Detective Crouch submitted a warrant affidavit for Kwamayne, and he was subsequently arrested on June 10, 2019, for felony child abuse resulting in serious injury. We note there is nothing in our record to show whether Kwamayne was ever convicted of any charges stemming from Ky'Lynn's injuries. In fact, according to the State's brief, Kwamayne "remains incarcerated awaiting trial to be heard before the District Court on September 14, 2020." Brief for appellee at 32.

Paige Worley is the case manager assigned to this case. Throughout this case, Worley had five visits with Ashley and attended four team meetings. Worley also reviewed the following: the current intake for this case, as well as three previous intakes; police interviews of Kwamayne and Ashley; police reports; jail calls from Kwamayne to Ashley; and medical notes from various providers. Worley also had conversations with those various medical providers. With respect to the four intakes noted above, Worley confirmed her understanding that the children were either present or involved in domestic violence situations related to Kwamayne and Ashley and that some of the incidents resulted in physical harm to the children; Worley acknowledged that the intakes involved other men, besides Kwamayne, as well. And on cross-examination, Worley acknowledged that the previous intakes were unfounded and the children were deemed to be safe. Throughout this case, Worley never spoke to Kwamayne.

According to Worley, Brooklyn and Ky'Ari were interviewed in May 2019. The interviews do not appear in our record. Worley was asked if both children talked about physical abuse they had experienced. She confirmed Brooklyn expressed that the abuse occurred more than once and that it was by both Kwamayne and Ashley. Worley also confirmed

- 137 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

that Ky'Ari expressed abuse by Kwamayne. Although details of the abuse were not elaborated upon in Worley's testimony, during cross-examination, she agreed that it was more accurate that the girls described getting spankings from their parents. Worley believed that it was in Ky'Ari's best interests to terminate Kwamayne's parental rights to her. When asked why, Worley responded, "Kwamayne has a history of violence and physical abuse, some of which Brooklyn . . . and Ky'Ari . . . have disclosed, and we're here because of Ky'Lynn's head trauma, as well, and I would be concerned that another child could sustain more injuries . . . ."

Carrie Hillebrandt has been Brooklyn's therapist since July 2019. Hillebrandt's July 2019 initial diagnostic interview report regarding Brooklyn was received into evidence. According to the report, Brooklyn stated Ky'Lynn "looked like she was dead" after she "got sick" and "could not hold her head up." The foster mother reported that during one of the first phone calls with Ashley, Brooklyn said, "'I don't want daddy to hit you till you bleed anymore'"; Brooklyn was then told by Ashley that they were not going to talk about "daddy anymore." Hillebrandt testified that Brooklyn refers to Kwamayne as "her dad," and calls her biological father by his first name. According to the report, Brooklyn denied sexual abuse, physical abuse, emotional abuse, or neglect. She also denied ever witnessing domestic violence. However, "[d]uring her trauma assessment and based on collateral information this does not appear to be the truth." Hillebrandt's recommendations included individual therapy to process trauma, build coping skills, and express feelings; family therapy with Ashley; and no contact between Brooklyn and Kwamayne.

After the initial diagnostic interview in July 2019, Hillebrandt met with Brooklyn on a weekly basis and continued to do so at the time of her testimony on December 2. During sessions, they have talked about the incident that brought Brooklyn into care; Brooklyn said she "heard [Ky'Lynn] crying and her dad yelling, and then when she saw her little sister, she — she thought her sister was dead."

- 138 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

Hillebrandt testified that during therapy sessions, "Brooklyn has made reference to her mother being hurt by her dad, who she identifies as Kwamayne"; "[s]he has made comments about being afraid that her dad was going to hit her mom in the face again or step on her face again." When asked if Brooklyn made one statement or multiple statements regarding domestic violence, neglect, or abuse, Hillebrandt responded, "[m]ultiple statements." Hillebrandt stated, "Most of what Brooklyn talks about is the domestic violence . . . we go over feelings, and so she talks about being hurt by watching her mom get beat on. She talks about worrying about her dad doing it again." When asked if it concerned her that Brooklyn had witnessed so much trauma at a young age, Hillebrandt responded, "Any child who witnesses that type of trauma builds unhealthy coping strategies and are high risk to repeating those patterns." On cross-examination, Hillebrandt acknowledged that she did not know how many incidents of domestic violence Brooklyn had seen. However, on redirect, Hillebrandt agreed it was fair to say Brooklyn had seen domestic violence between Ashley and Kwamayne more than once.

During family therapy, Hillebrandt asked Ashley about Brooklyn's trauma history and Ashley talked about a "long history" of domestic violence with Kwamayne "and that she was terrified of him." Ashley did not tell Hillebrandt what happened to her during the domestic violence incidences, but she did say that the children were present at times.

We note that during the course of Hillebrandt's cross-examination, the juvenile court told Kwamayne he was becoming disruptive to the proceedings. After some back-and-forth between the court and Kwamayne, the court asked Kwamayne to remain silent and said that it would find him in contempt of court if he did not remain silent. After a later outburst by Kwamayne, the court found him in contempt of court and excused him from the courtroom. Kwamayne was later sentenced to 30 days in jail on his contempt citation "to be served concurrently with his present incarceration."

### 3. Juvenile Court's Decision

In an order filed on December 9, 2019, the juvenile court adjudicated Ky'Ari to be within the meaning of § 43-247(3)(a) by the reason of the fault or habits of Kwamayne for the reasons alleged in the amended supplemental petition. The juvenile court also terminated Kwamayne's parental rights to Ky'Ari after finding by clear and convincing evidence that reasonable efforts were not required and statutory grounds for termination existed pursuant to § 43-292(2), (9), and (10) and that termination of parental rights was in the child's best interests.

Kwamayne appeals.

## III. ASSIGNMENTS OF ERROR

Kwamayne assigns, summarized, that the juvenile court erred in (1) adjudicating Ky'Ari to be within the meaning of § 43-247(3)(a) by reason of his fault or habits and (2) terminating his parental rights to Ky'Ari.

## IV. STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## V. ANALYSIS

### 1. Adjudication

[2] In order to obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). The State must prove such allegations by a preponderance of the evidence. *Id*.

In count I of the amended supplemental petition, the State alleged that Ky'Ari was a child within the meaning of § 43-247(3)(a) because she lacked proper parental care by

- 140 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

reason of the fault or habits of Kwamayne. The State specifically alleged that Ky'Lynn was diagnosed with injuries consistent with intentional physical abuse and that Kwamayne, her caregiver, was unable to provide a reasonable explanation for the injuries. The State further alleged that Kwamayne failed to provide proper parental care, support, and/or supervision for the juveniles and that due to all of the allegations, Ky'Ari was at risk for harm.

According to the evidence presented at the combined adjudication and termination hearing, Kwamayne was alone with Ky'Ari, Brooklyn, and Ky'Lynn after Ashley left for work shortly before 10 a.m. on May 29, 2019. A couple hours later, he ran to Ashley's work and informed her that something was wrong with Ky'Lynn. An ambulance was called, and Ky'Lynn was taken to the emergency room and thereafter had to have emergency surgery to relieve pressure and drain fluid off of her brain. Ky'Lynn was subsequently diagnosed with abusive head trauma.

Kwamayne did not have a reasonable explanation for Ky'Lynn's injuries. According to Dr. Haney, neither of Kwamayne's two theories—the car accident and Ky'Lynn's hitting her head while being held by Brooklyn, both of which occurred prior to May 29, 2019—were consistent with Ky'Lynn's injuries. Dr. Haney testified that with the severity of Ky'Lynn's injuries, symptoms would have appeared "[r]elatively quickly, within probably minutes to an hour," and she would have been "noticeably unwell" as evidenced by "[n]ot responding, maybe significant vomiting, probably clinically deteriorating [(decreased responsiveness, moaning, maybe even seizing)]." Both Kwamayne and Ashley reported that Ky'Lynn was fine when Ashley went to work that morning.

Dr. Haney stated the severity of Ky'Lynn's injuries was not consistent with any sort of a short household fall, and a laboratory evaluation ruled out any sort of a bleeding disorder or infection. Dr. Haney testified that left "abusive head trauma as the only diagnosis." And on cross-examination, she stated

- 141 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

that none of the "20 or 30" doctors on Ky'Lynn's medical team disagreed with that diagnosis.

[3] Based on the evidence presented, Ky'Lynn suffered "abusive head trauma" while in Kwamayne's care. We acknowledge that Ky'Ari was not injured that day. However, the State need not prove that the child has actually suffered physical harm; Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. See *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). We find, by a preponderance of the evidence, that the severe nonaccidental injuries sustained by Ky'Ari's 3-month-old sister while in Ky'Ari's father's care certainly puts Ky'Ari at risk for future harm. Therefore, we find that the conditions alleged fit within § 43-247(3)(a) and we affirm the adjudication of Ky'Ari due to the fault or habits of Kwamayne.

## 2. STATUTORY GROUNDS FOR TERMINATION

[4] In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Kwamayne's parental rights to Ky'Ari, the juvenile court found that statutory grounds existed pursuant to § 43-292(2) (substantial and continuous or repeated neglect of juvenile or sibling), § 43-292(9) (juvenile or another minor child subjected to aggravated circumstances), and § 43-292(10) (felony assault resulting in serious bodily injury to juvenile or another minor child of parent). We will address each statutory ground, but in reverse order.

### (a) § 43-292(10)

Pursuant to § 43-292(10), parental rights may be terminated when the parent has (a) committed murder of another

- 142 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

child of the parent; (b) committed voluntary manslaughter of another child of the parent; (c) aided or abetted, attempted, conspired, or solicited to commit murder, or aided or abetted voluntary manslaughter of the juvenile or another child of the parent; or (d) committed a felony assault that resulted in serious bodily injury to the juvenile or another minor child of the parent. It is only § 43-292(10)(d) that is at issue in this case. Although the State alleged, and the juvenile court determined, that Kwamayne's parental rights should be terminated on this ground, we disagree that this statutory ground can be applied under the circumstances present in this case. We also note that although the State argued in its brief on appeal that the juvenile court was correct in finding that Kwamayne's parental rights could be terminated under § 43-292(10), the State subsequently conceded at oral argument that the juvenile court erred in finding that section applicable to this case.

Section 43-292(10)(d) plainly states that parental rights may be terminated when the parent has "committed a felony assault that resulted in serious bodily injury to the juvenile *or another minor child of the parent*." (Emphasis supplied.) Here, there is no evidence of an assault on "the juvenile" at issue, Ky'Ari. And as stated previously, our record does not establish that Kwamayne is Ky'Lynn's father. Although our record contains various statements that Kwamayne is Ky'Lynn's father, he is not listed on her birth certificate and there is no order establishing paternity appearing in our record. Moreover, although Kwamayne was ordered to undergo paternity testing regarding Ky'Lynn, our record does not reveal whether such testing took place or the results of any such testing. Because it has not been established that any felony assault resulting in serious bodily injury was committed by Kwamayne against a minor child of his, there is no basis for terminating his parental rights to Ky'Ari on this ground. The lack of evidence regarding Ky'Lynn's parentage resolves this issue, and we therefore need not get to the issue of whether § 43-292(10) requires a criminal conviction as a prerequisite to using this subsection

- 143 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

as a basis for termination. See *In re Interest of Carmelo G.*, 296 Neb. 805, 896 N.W.2d 902 (2017) (appellate court not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

We note that § 43-292(8) was understandably not alleged as a ground for termination in this case given its limited scope; that statutory provision does provide another ground for termination based on the infliction of serious bodily injury by non-accidental means. However, § 43-292(8) is limited to the parent's infliction of such injury on the juvenile at issue, Ky'Ari in this case; it does not include, like other subsections do, the infliction of such injury on a sibling of the juvenile, another minor child of the parent, or another minor child.

The abusive head trauma sustained by Ky'Lynn cannot serve as a ground for the termination of Kwamayne's parental rights to Ky'Ari under § 43-292(10). Thus, we next consider whether the abusive head trauma sustained by Ky'Lynn can serve as a ground for the termination of Kwamayne's parental rights to Ky'Ari under § 43-292(9).

### (b) § 43-292(9)

[5-7] Pursuant to § 43-292(9), parental rights may be terminated when "[t]he parent of the juvenile has subjected the juvenile *or another minor child* to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse." (Emphasis supplied.) Whether aggravated circumstances exist is determined on a case-by-case basis. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). The Legislature has not defined in the juvenile code the phrase "aggravated circumstances," but the Nebraska Supreme Court has cited with approval the New Jersey Superior Court, which stated that "'where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety and welfare of the child, they are "aggravated" . . . .'" *In re Interest of Jac'Quez N.*, 266 Neb. 782, 791, 669 N.W.2d 429, 436 (2003), quoting *New Jersey Div. v. A.R.G.*, 361 N.J. Super. 46, 824 A.2d 213 (2003).

- 144 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

[8] The Nebraska Supreme Court has determined that aggravated circumstances exist when a child suffers severe, intentional physical abuse. See *In re Interest of Ryder J., supra* (father subjected son's half brother from mother's previous relationship to "aggravated circumstances" under § 43-292(9) when he subjected half brother to severe, intentional physical abuse, even though half brother suffered no permanent injury or disability; half brother had bruising, swelling, and abrasion to his genitals and surrounding area, petechial hemorrhaging across his face, significant bruises on several areas of his body, and a hemorrhage in his right eye).

This court has also addressed the termination of parental rights based on "aggravated circumstances" pursuant to § 43-292(9). In *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017), the juvenile court terminated a mother's and father's parental rights to their respective children in part based on § 43-292(9), but this court reversed on appeal after finding, in part, that aggravated circumstances were not proved by clear and convincing evidence. In that case, the father's almost 2-year-old child was being cared for by the mother of his other children. The almost 2-year-old child was standing on the armrest of a couch and fell off, landing face first on the floor, which was made of vinyl covering tile placed over concrete. Other than a knot above his eye and a black eye, the child appeared to be acting normally for 9 days. Then, on a night that he was again being cared for by the mother of the father's other children, he appeared stiff and was unable to be awakened but displayed no other concerning symptoms; he was believed to be sleeping. The caregiver and the father were in contact, and the father even stopped by to check on the child. The father and the caregiver both stated that they became less concerned about the stiffness when the child's mother indicated the child had experienced stiffness as a baby and that their concerns were additionally alleviated by the father's internet research. The caregiver checked on the child throughout the night, but the child did not experience

- 145 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

any more stiffness and appeared to be sleeping. As soon as the child's condition worsened the next morning (stiff leg and one eye open but not focusing or looking at the caregiver), the caregiver called the father, who responded immediately and took the child to a hospital. At the hospital, the child was diagnosed with a skull fracture above the eye, a subdural hematoma, and a significant brain injury. He was taken into surgery to have the hematoma drained.

In *In re Interest of Elijah P. et al., supra*, text messages between the father and the caregiver supported the series of events reported by them, and forensic interviews of the other children did not indicate concerning behavior by the caregiver on the nights in question. At trial, Dr. Haney, the same child abuse pediatrician involved with Ky'Lynn's care, opined that the child's injuries were the result of two separate incidents: one incident occurred when he fell off of the couch which caused the skull fracture above his eye but did not cause any long-term consequences and, in her opinion, a second incident of trauma occurred around the time he became symptomatic 9 days later and led to the subdural hematoma, brain injury, and seizures. In addition, Dr. Haney testified that the severity of the child's brain injury and subdural hematoma was not consistent with a short fall and that he would have begun to display symptoms within minutes to hours after sustaining an injury that caused the type of subdural hematoma he had. Thus, based on the history provided to her and the lack of any significant accidental trauma, Dr. Haney opined that the subdural hematoma and brain injury were the result of inflicted blunt force trauma.

On appeal, this court stated that the only evidence presented at trial on which a finding of intentional abuse could be based was Dr. Haney's opinion that the child's brain injury and subdural hematoma were not caused by the fall from the couch. But she admitted that the height of the fall was not presented to her, and her records incorrectly indicated that he fell off a couch and hit his head on a table. This court also

- 146 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

considered the caregiver's history with that child and the other children and considered text messages sent on the night the child fell off of the couch and the messages sent 9 days later, which revealed "genuine concern." *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 538, 891 N.W.2d 330, 344 (2017). This court also considered that the police found no "hard evidence" indicating that the child's injuries were intentionally caused. *Id.*

This court determined that although Dr. Haney's testimony could support a conclusion that the caregiver intentionally inflicted the child's injuries, when coupled with the circumstantial evidence presented at trial, the totality of the evidence did not rise to the level of clear and convincing in order to support a finding that the caregiver intentionally harmed the child. *Id.* This court also found that the caregiver's and the father's delay in seeking medical attention did not amount to aggravated circumstances because before they sought treatment, the child did not display obvious, serious physical injuries. *Id.* Compare *In re Interest of Jac'Quez N.*, 266 Neb. 782, 669 N.W.2d 429 (2003) (concluding aggravated circumstances existed where parents delayed seeking medical attention for 2 days when child had suffered obvious, serious physical injuries).

However, in *In re Interest of Gavin S. & Jordan S.*, 23 Neb. App. 401, 873 N.W.2d 1 (2015), this court affirmed a termination of parental rights based on "aggravated circumstances" pursuant to § 43-292(9). In that case, the parents' rights to their two children were terminated pursuant to § 43-292(9) after a child in the in-home daycare run by the parents died as a result of severe head trauma. The evidence presented by the State at the termination hearing revealed that when the 1-year-old child arrived at the parties' daycare, he was alert, playful, and happy. And, although he was suffering from an undiagnosed skull fracture, that injury had begun to heal and, on that morning, was not affecting the child in a significant way. Approximately 8 hours after the child arrived at the parties' home, he was pronounced dead due to recent and severe head trauma

- 147 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

similar to that incurred in a fall from a height of at least 12 feet or in a car accident. Such trauma was so significant that anyone would have been able to observe an immediate and dramatic change in the child; he would have had trouble breathing and moving his limbs, and soon after sustaining the injury, he would have become completely unresponsive.

> Clearly, [the child] did not have such an injury when he arrived at [the parties'] home. [The parties] were the only people who provided care for [the child] during and after the time he sustained this serious injury. Neither [of the parties] offered any explanation for [the child's] injury or death.

*In re Interest of Gavin S. & Jordan S.*, 23 Neb. App. at 414-15, 873 N.W.2d at 10. Upon our de novo review of the record in that case, and giving weight to the juvenile court's findings about witness credibility, we concluded that there was clear and convincing evidence presented at the termination hearing to demonstrate that the parties subjected the child to "aggravated circumstances" pursuant to § 43-292(9).

We find the case before us to be similar to the facts in *In re Interest of Gavin S. & Jordan S., supra*. The evidence presented by the State at the termination hearing revealed that when Ashley left for work, 3-month-old Ky'Lynn was fine. A couple hours later, Kwamayne ran to Ashley's place of employment, stating that something was wrong with Ky'Lynn. Ky'Lynn was subsequently transported to UNMC, and she arrived "with an episode of unresponsiveness, and then eventually she went apneic or stopped breathing" in the emergency room. It was discovered that she had a large subdural hematoma that required surgical intervention. Burr holes were placed into Ky'Lynn's skull to relieve pressure, but when bleeding continued, the neurosurgeon had to temporarily remove part of the skull to repair the bleeding. In addition to the subdural hematoma, Ky'Lynn had injury to the parenchyma of the brain (the brain tissue) itself, and she had retinal hemorrhages noted in her left eye that "were described as too

- 148 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

numerous to count." Dr. Haney stated that accidents and any sort of a bleeding disorder or infection were ruled out. She stated that abusive head trauma was left as the only diagnosis and that none of the "20 or 30" doctors on Ky'Lynn's medical team disagreed with the diagnosis.

On cross-examination, Dr. Haney was asked, in her opinion, how Ky'Lynn's injuries occurred. Dr. Haney responded, "I don't know if she was thrown into something, if she was slammed on something, if she was shaken and slammed. I don't know because I wasn't there." However, Dr. Haney thought it was "very likely" that Ky'Lynn was shaken "and probably slammed, too," because "[s]he had unilateral injuries, and I see those more when there's also a significant impact." When asked how much force is necessary to cause a subdural hematoma, Dr. Haney responded, "[Y]ou can't test it to find out, but this is well beyond that seen in normal parenting."

Dr. Haney testified that with the severity of Ky'Lynn's injuries, symptoms would have appeared "[r]elatively quickly, within probably minutes to an hour," and she would have been "noticeably unwell" as evidenced by "[n]ot responding, maybe significant vomiting, probably clinically deteriorating [(decreased responsiveness, moaning, maybe even seizing)]."

Based on the evidence presented at trial, Ky'Lynn did not have a head injury when Ashley left for work. Kwamayne was the only person who provided care for Ky'Lynn during the timeframe she would have sustained the injury, and he did not offer any reasonable explanation for the injury. Additionally, there was other evidence in the record to show Kwamayne exhibited violent behavior in the past. According to Hillebrandt's report and testimony, Brooklyn made statements that Kwamayne had hit Ashley until she bled and that he stepped on Ashley's face. These additional considerations distinguish this case from *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017). On our de novo review of the record, we conclude that there was clear and convincing evidence presented at the termination hearing to prove that

- 149 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

Kwamayne subjected Ky'Lynn to "aggravated circumstances" pursuant to § 43-292(9). Accordingly, there was clear and convincing evidence to show that grounds for termination of Kwamayne's parental rights to Ky'Ari under § 43-292(9) were proved by sufficient evidence.

(c) § 43-292(2) and Reasonable Efforts

We need not consider whether termination of parental rights was proper pursuant to § 43-292(2), since any one of the 11 grounds identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). Thus, the next inquiry is whether termination was in Ky'Ari's best interests.

We note that in his brief, Kwamayne argues that the supplemental petition and termination of parental rights "simply alleged that [Kwamayne] 'has subjected said child to aggravated circumstances[,]'" and "[t]he 'said child' in this case was Ky'Ari alone"; thus, the State failed to present evidence showing that he subjected Ky'Ari to aggravated circumstances and that reasonable efforts were not required. Brief for appellant at 19. However, reasonable efforts to reunify a family are required under the juvenile code only when termination is sought under § 43-292(6). *In re Interest of Hope L. et al.*, 278 Neb. 869, 775 N.W.2d 384 (2009). See, also, *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). Section 43-292(6) was neither alleged nor determined to be a ground for termination in this case.

3. BEST INTERESTS AND UNFITNESS

[9,10] Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; as such, before a court

- 150 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF KY'ARI J.
Cite as 29 Neb. App. 124

may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

[11-14] There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nicole M., supra*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

[15] We recognize that there is no evidence that Kwamayne has ever abused Ky'Ari. But there is clear and convincing evidence that Kwamayne seriously abused Ky'Ari's sister, Ky'Lynn. And the Nebraska Supreme Court has stated, "[I]n our view, the abuse of *any* child by an adult—regardless of whether it is the adult's own child or the child of another—calls that adult's ability to parent into serious question." *In re Interest of Ryder J.*, 283 Neb. at 327, 809 N.W.2d at 262. The fact that Kwamayne has not yet abused Ky'Ari is inconsequential. "We need not wait for a disaster to strike before taking protective steps in the interests of a minor child." *Id*. See, also, *In re Interest of Gavin S. & Jordan S.*, 23 Neb. App. 401, 873 N.W.2d 1 (2015) (even though there was no evidence presented about inappropriate or violent actions by parents with their own children, and there was evidence that parents had strong bond with their children, the risk of harm

to the children in parents' home was simply too much to over-come; no reasonable alternative existed other than to terminate parental rights). In addition to there being clear and convincing evidence that Kwamayne caused a severe, nonaccidental injury to Ky'Ari's sister, there was also evidence that Kwamayne abused Ky'Ari's mother—that Kwamayne hit Ashley until she bled and that he stepped on Ashley's face. Under the circum-stances of this case, we find that the State has rebutted the pre-sumption of parental fitness as to Kwamayne. We further find that there is clear and convincing evidence that it is in the best interests of Ky'Ari to terminate Kwamayne's parental rights.

## VI. CONCLUSION

For the reasons stated above, we affirm the order of the juve-nile court terminating Kwamayne's parental rights to Ky'Ari.

AFFIRMED.