IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF H.M. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF H.M. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ALAINA K., APPELLANT, AND ROBERT M., APPELLEE.


Filed July 15, 2025.    Nos. A-24-948 through A-24-950.


Appeals from the County Court for York County: LYNELLE D. HOMOLKA, Judge. Affirmed.

Jerry D. Clinch, of Clinch Law Firm, L.L.C., for appellant.

Christopher M. Johnson, Chief Deputy York County Attorney, for appellee.


PIRTLE, BISHOP, and ARTERBURN, Judges.

PIRTLE, Judge.

## INTRODUCTION

Alaina K. appeals the decision of the county court for York County, sitting as a juvenile court, that terminated her parental rights. For the reasons that follow, we affirm.

## BACKGROUND

### FACTUAL BACKGROUND

Alaina is the biological mother of three children, H.M., R.M., and S.M. Robert M. is their biological father. H.M. was born in August 2019, R.M. was born in October 2020, and S.M. was born in July 2022.

On February 21, 2023, the three children were living with Robert when his probation officer conducted a search of his residence. During the search, officers discovered

- 1 -

methamphetamine and drug paraphernalia. The apartment was also covered in trash and dirty diapers and the children were sleeping on urine soaked mattresses. Consequently, the children were removed from the home and Robert was arrested for possession of a controlled substance and child abuse.

On February 22, 2023, the State filed three petitions and applications for ex parte orders to remove the children from the home and place them in the custody of the Nebraska Department of Health and Human Services (DHHS). After the court granted the ex parte orders, DHHS eventually placed the children with Robert's mother.

On March 17, 2023, Alaina filed a motion for change of placement wherein she requested the children be placed with her. Over the next several months, three hearings were held to address various issues including Alaina's motion. At one of these hearings held on August 3, 2023, Robert entered a no contest admission and the children were adjudicated to be within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Because Alaina failed to appear at this hearing as well as the previous hearing, the court denied her motion for change of placement.

On August 14, 2023, Alaina filed another motion for change of placement. A hearing was held on August 31. At this hearing, it was revealed that Alaina had not completed a drug test since April 5. Notably, her last drug test was presumptive positive for methamphetamine. Because a negative drug test was required for her to participate in supervised visitations, Alaina was unable to see her children until she agreed to take a new drug test. At the time of the hearing, Alaina's last supervised visit took place on June 26.

Two incidents that occurred during Alaina's supervised visits in June 2023 were also raised during the hearing. During a June 16 visit, it was reported that Alaina spanked R.M. Then during her last visit on June 26, the visitation agency reported she spanked H.M. and then prevented the visitation worker from leaving. Because Alaina disagreed with these allegations, she requested a new visitation agency. However, two agencies subsequently denied her services because she never responded to their calls.

After the hearing, the court ultimately denied Alaina's motion for change of placement. The court reported that it denied the motion because she was refusing to take drug tests, not participating in the supervised visits, not completing weekly therapy sessions, refusing to engage in family support services, remained unemployed, and was at risk of losing her housing.

On October 23, 2023, Alaina filed another motion for change of placement. A hearing was held on November 16. At this hearing, Alaina's DHHS caseworker testified. She stated that since August 31, Alaina had tested presumptive positive for methamphetamine approximately five times and had three supervised visits canceled due to her failure to communicate with the visitation agency. Alaina also testified and discussed how she was in danger of losing her housing because the charity currently paying her rent was going to stop at the end of the year. Because she continued to miss visits, not be employed, and not have stable housing, the court denied Alaina's motion for change of placement.

Two more hearings were held on various issues in December 2023 and February 2024. Alaina failed to appear at both hearings. DHHS later discovered that Alaina was homeless and living out of her car. When DHHS put her in contact with local charities, Alaina told them she was trying to get a housing voucher through the Lincoln Housing Authority. However, over the next several months, she stopped taking drug tests, did not participate in supervised visits, refused to

participate in family support services, did not abide by the court's directive to be in therapy, and failed to regularly communicate with her case manager.

On June 4, 2024, the State filed supplemental petitions to terminate Alaina's parental rights to all three children. The petitions alleged that conditions existed under Neb. Rev. Stat. § 43-292(2), (6) and (7) (Reissue 2016). Four witnesses testified at the August 19 hearing.

Candice Stone was the DHHS caseworker managing Alaina's case from May 2023 to November 2023. When she took over, Alaina had three primary goals: (1) Address her mental and physical health; (2) address her parenting skills and establish relationships with the children; and (3) provide a safe home, surround herself with appropriate people, and develop appropriate support systems. To help achieve these goals, Alaina was directed to complete a mental health evaluation, establish a primary care provider, sign releases of information, work with family support services, attend all scheduled meetings, and participate in supervised visitations. Stone stated that Alaina was making some positive progress when she began working with her in May 2023, but that progress did not last. Around this time, Alaina refused family support services, stopped taking the required drug tests, stopped seeing a therapist after only a couple sessions, refused to sign information releases so that she could take the required evaluations, was unemployed, and was unable to support herself.

In June 2023, after Stone had been working with her for around a month, Alaina stopped having supervised visits with her children. This was primarily because she refused to do the mandated drug tests. Another reason was due to the reports that Alaina spanked H.M. and R.M. during the two June visits. Stone described how after one of these incidents, the visitation worker attempted to end the visit early but Alaina refused to let her leave the house. Alaina then requested a different agency but failed to respond when they tried to contact her. This led to four different agencies discharging her over the next several months. As a result, she did not see her children until she started taking the required drug tests in October. However, because she failed to show up for one visit and tested presumptive positive for methamphetamine before another, she only had four visits in October. Notably, these visits were the last time she saw her children.

Overall, Stone stated that working with Alaina was difficult. Alaina refused to communicate with her, refused services provided by DHHS, and did not always attend family team meetings and court hearings. When Stone was able to contact Alaina, she typically expressed frustration about DHHS and said she would refuse services until her children were returned. Because Alaina twisted her words after their meetings, Stone eventually felt the need to bring a coworker to verify their conversations.

Stone said that Alaina made no progress in her case plan goals during the time she managed her case. By November 2023, Alaina was not complying with supervised visits, drug testing, or therapy requirements. Additionally, because the charity was not going to pay her rent in 2024, Alaina was at risk of becoming homeless.

Kindale Andreen took over as Alaina's case manager in December 2023. When she inherited the case, she described Alaina's progress as "poor" because she was refusing drug tests, not doing supervised visits, not participating in family support services, and not enrolled in therapy. She said she attempted to set up visitation services for Alaina in January and February

2024, but that multiple agencies denied their services because Alaina failed to respond. Around that time, Andreen also scheduled two appointments for Alaina to meet with a family support service, but she missed both appointments. Further, in March, another visitation agency denied Alaina services due to her lack of communication. At that point, because Alaina had been denied services by four different agencies, with one denying her three separate times, Andreen informed her that they needed to meet and discuss her willingness to participate in services before arranging for more providers. Alaina responded 2 weeks later and subsequently rescheduled the meeting multiple times between March and May. Although Andreen arranged transportation services for Alaina to come to her office, the meeting only occurred in June after a scheduled court date.

In February 2024, Andreen learned that Alaina was homeless and living out of her vehicle. Upon learning this, she connected her with local charities, but Alaina was already attempting to get a housing voucher from the Lincoln Housing Authority. Throughout her time managing the case, Andreen also offered Alaina bus passes, gas vouchers, transportation services, family support services, visitation services, and therapy. She also helped Alaina get on a waitlist to complete a required psychological evaluation. However, Alaina never came to her office to pick up the gas vouchers, missed her scheduled transportation services, refused to participate in family support services, declined to take drug tests, and missed her appointment to complete the psychological evaluation.

Additionally, despite receiving a housing voucher from the Lincoln Housing Authority, Alaina never obtained housing. Although she could have used the voucher to secure a one-bedroom apartment, she wanted a larger apartment so her children could live with her. However, to qualify for a larger apartment, Alaina needed a letter from DHHS showing reunification was the children's permanency goal. But because her case plan had changed from a single permanency objective of reunification to a concurrent goal of adoption, DHHS was unable to provide the letter. When Andreen explained this to Alaina she declined further assistance with her housing. As a result, even though she possessed a housing voucher, Alaina was living in a homeless shelter at the time of the hearing.

Andreen then discussed Alaina's progress since the petition to terminate her parental rights was filed in June 2024. After the petition was filed, Alaina got a part-time job working 20 hours a week, began taking drug tests again, signed information releases that she had previously refused to sign, started working with family support services, enrolled in therapy, and completed at least one parenting course. However, despite these steps, Andreen still believed that terminating Alaina's rights was in the children's best interests. She essentially articulated how several weeks of last minute progress did not overshadow months of failure.

Andreen also discussed the children's progress since last seeing Alaina in October 2023. Since then, Andreen observed marked improvements in the children's behaviors. She reported that having a consistent caregiver in their lives had benefited them socially, educationally, and emotionally. She also noted that the children did not mention Alaina, did not ask about her, and did not appear to miss her.

Overall, Andreen believed that Alaina's history of noncompliance demonstrated an inability to meet the children's needs. She did not believe Alaina could provide the children with stability and did not think she would be able to do so in the near future. Further, she discussed how Alaina's ongoing problems with homelessness exhibited an inability to care for herself. Because

Alaina had been absent from the children's lives for approximately 10 months, and in that time the children had made "huge improvements in their emotional, social, [and] educational well-being," Andreen believed it was in the children's best interests to terminate Alaina's parental rights.

Alaina then testified and discussed the recent changes in her life. She said that she began working with family support services to get housing, became employed, started seeing a therapist, completed two parenting courses, and was attending weekly Narcotics Anonymous meetings. However, it became apparent that these changes were only made after the petition to terminate her parental rights was filed. She testified that she had been employed for only a few weeks after having been unemployed since February 2023, began seeing a therapist just 2 weeks earlier, completed a parenting course 4 days before the hearing, and had been attending Narcotics Anonymous meetings for approximately a month. Additionally, although she claimed to have completed two parenting courses, she was unable to recall the name of the second one.

Throughout her testimony, Alaina demonstrated an inability to take accountability for her failures. Despite substantial evidence to the contrary, she claimed that she had been trying to progress in her case plan goals ever since the children were removed. And although she had a history of failing to appear for court, refusing drug tests, and not participating in the multitude of services provided by DHHS, she claimed that she did everything that was asked of her. With this, she blamed DHHS for not helping her enough. More specifically, she claimed that Andreen failed to communicate with her and that DHHS did not provide her with adequate assistance when it came to housing and transportation. And although she tested presumptive positive for methamphetamine multiple times in the past several months, she testified that she had not used any drugs since 2019.

Alaina next discussed her relationships with her children. She explained that prior to their removal from Robert's home in February 2023, she had not seen them in 4 months. This meant that her only contact with the children since September 2022 were the supervised visits she had from February to June 2023 and the four visits in October. But even during those periods, there were prolonged times when she did not see her children because she refused to take drug tests, missed visits, or tested presumptive positive for methamphetamine. Notably, the last time she saw her children was during the last visit in October. While Alaina claimed to have kept in contact with her children since then, she later clarified that her only communication with them was sending two birthday presents within the last month.

Alaina was then asked about her recent contacts with law enforcement. She discussed how she was given a citation on July 26, 2024, for destruction of property after an incident at the homeless shelter. She then denied another incident from May 2024, when an officer reported that she punched a vehicle while drunk. She claimed the officer lied because she has never drunk alcohol before. She stated that if she was reunited with her children, they would live at the homeless shelter, which she conceded was not a stable environment. She also acknowledged that being employed for 1 month did not constitute having stable employment or income.

Jon Thomas, the children's guardian ad litem, testified last. He articulated his belief that Alaina's parental rights should be terminated. He based his opinion on her "general refusal to participate in any capacity for a prolonged amount of time up until the filing of the [s]upplemental [p]etition to [t]erminate [her] [p]arental [r]ights." He also discussed how Alaina no longer had substantive relationships with the children because she failed to participate in the supervised visits

and made no effort to communicate with them for nearly 10 months. While he acknowledged her recent progress, he believed it was too late and had only occurred because of the threat to her parental rights.

On November 19, 2025, the juvenile court issued three orders terminating Alaina's parental rights to the three children. The court determined the State proved by clear and convincing evidence that conditions existed under § 43-292(2), (6), and (7) and that terminating her parental rights was in the children's best interests. In its orders, the court discussed Alaina's erratic behaviors, refusals to communicate with DHHS, refusals to engage in multiple services, and failures to appear for appointments and court hearings.

Although the court acknowledged her recent positive changes, it explained that it could not ignore her prolonged noncompliance and refusals to participate in offered services. Specifically, the court cited her testing presumptive positive for methamphetamine multiple times, subsequently refusing to take drug tests, being unemployed without stable housing, not completing court-ordered evaluations, refusing to sign required releases, and not attending therapy as directed. Ultimately, the court concluded that Alaina's history of noncompliance, unemployment, and homelessness demonstrated an inability to provide the children with a safe and stable home.

The court's orders also provided updates regarding Alaina's progress since the termination hearing. Following the hearing, Alaina filed a motion to allow virtual or phone visits. However, she failed to appear at the September 5, 2024, hearing. Likewise, she failed to appear at an October 21 review hearing although DHHS arranged for a transportation service to pick her up. The court further reported that Alaina had tested positive for alcohol on September 11. She subsequently refused further drug tests, stopped going to therapy, and refused to meet with DHHS altogether.

Alaina now appeals the termination of her parental rights. We have consolidated the three cases on appeal.

## ASSIGNMENTS OF ERROR

Restated, Alaina assigns that the juvenile court erred in determining that (1) DHHS made reasonable efforts to reunify her with her children; (2) the State met its burden to prove that she was unfit to parent her children by clear and convincing evidence; and (3) terminating her parental rights was in her children's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jordon B.*, 316 Neb. 974, 7 N.W.3d 894 (2024). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of facts over the other. *In re Interest of Jeovani H.*, 316 Neb. 723, 6 N.W.3d 539 (2024).

## ANALYSIS

Termination of parental rights is a two-part inquiry. The juvenile court must first find by clear and convincing evidence that one of the statutory grounds under § 43-292 is met and second that termination is in the child's best interests. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

Although Alaina does not contest that a statutory ground was met to terminate her parental rights under § 43-292, for the sake of completeness, we conclude that the statutory ground under § 43-292(7) was met. There are 11 bases for parental termination under § 43-292. Only one must be met to provide the statutory basis for termination. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Once one of the bases is met, the appellate court does not need to consider the sufficiency of evidence concerning the State's other bases for termination. *Id.*

Subsection (7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

The evidence demonstrated that H.M., R.M., and S.M. were removed from their parental home on February 21, 2023, and had been in DHHS custody ever since. Accordingly, when the motion to terminate Alaina's parental rights was filed in June 2024, they had been in an out-of-home placement for 16 months. Therefore, we determine the State proved by clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months when it filed the motion to terminate Alaina's parental rights.

REASONABLE EFFORTS

Alaina's first assignment asserts the juvenile court erred in determining that DHHS made reasonable efforts to reunify her with her children.

This Court and the Nebraska Supreme Court have consistently indicated that reasonable efforts to reunify a family are required under the juvenile code only when termination is sought under § 43-292(6). *In re Interest of Ky'Ari J.*, 29 Neb. App. 124, 952 N.W.2d 715 (2020); *In re Interest of Jade H. et al.*, 25 Neb. App. 678, 911 N.W.2d 276 (2018); *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). Because we have determined that termination was proper pursuant to § 43-292(7), we need not determine whether the juvenile court erred in finding that reasonable efforts were made to reunify Alaina with her children.

UNFITNESS AND BEST INTERESTS

Alaina's next two assignments take issue with the court determining that she was unfit and that terminating her parental rights was in the children's best interests. Because the best interests and parental fitness analyses examine essentially the same underlying facts, we review these assignments together.

A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's

well-being. *Id.* Parental obligation requires a continuing interest in the children and a genuine effort to maintain communication and association with the children. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

In determining whether a parent is unfit, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Leyton C. & Landyn C., supra.* As children cannot and should not be suspended in foster care or be made to await uncertain parental maturity, when a parent is unable or unwilling to rehabilitate themselves within a reasonable period of time, the child's best interests require termination of parental rights. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Last minute attempts by a parent to comply with the rehabilitative plan do not prevent the termination of parental rights. *Id.*

We first determine the juvenile court did not err in finding that Alaina was unfit to parent the children. Since the children's removal from Robert's home in February 2023, Alaina failed to demonstrate she could provide them with any form of stability. Throughout most of the time she was involved with DHHS, she was unemployed and without stable housing. More so, she refused to accept services provided by DHHS that could have assisted her, routinely failed to attend court hearings, and failed to abide by court orders. And despite being directed to, she refused to partake in therapy, sign releases, take drug tests, and regularly communicate with her case managers. Because she refused to take drug tests and cooperate with DHHS, she went 10 months without seeing or contacting the children.

Alaina's failure to communicate with relevant providers and DHHS proved to be a consistent theme that hindered DHHS' ability to assist her. Stone testified that in the 7 months she worked as Alaina's case manager, four different visitation agencies denied her services due to a lack of communication. This trend continued when Andreen took over with additional visitation and family support agencies denying their services after they were unable to contact her. After these providers denied their services, Andreen told Alaina they needed to meet before any more providers would be contacted. Despite this meeting being a prerequisite to seeing her children, and being offered transportation services to attend, Alaina rescheduled the meeting multiple times from March to May 2024 and ultimately only spoke with Andreen in June at a scheduled court hearing.

Further, the evidence demonstrates that Alaina does not have beneficial relationships with the children. Because Alaina had not seen her children for 4 months prior to their removal in February 2023, the only times she has seen her children in the last 2 years were during supervised visits. And because she tested presumptive positive for methamphetamine multiple times, missed several visits, and refused to take drug tests for significant portions of 2023, she only saw her children several times between February and June and during four visits in October. She has since gone 10 months without seeing them. Given her absence from their lives, it is not surprising that her children do not ask or talk about her.

Although we recognize the positive steps Alaina took to become employed and abide by her case plan in the weeks preceding the termination hearing, we determine her last minute attempts do not override her prior exhibited deficiencies. Nothing in the record demonstrates that Alaina was, or will be, capable of providing for herself, let alone be able to provide for three children. At the time of the hearing, she still resided in a homeless shelter and did not have attainable plans to secure housing large enough for her and the children. Additionally, although

we do not consider Alaina's actions following the termination hearing in our analysis, we note that her renewed refusals to cooperate with DHHS and to submit to drug testing confirm the expressed concerns regarding her ability to make sustained progress.

We conclude that Alaina's failure to cooperate with DHHS, demonstrated an inability to provide for herself, and lack of meaningful relationships with the children constitute personal deficiencies that have prevented, and likely will continue to prevent, her from fulfilling reasonable parental obligations. Accordingly, we determine the juvenile court did not err in finding she was unfit.

For similar reasons, we also determine the juvenile court did not err in concluding that terminating Alaina's parental rights was in the children's best interests. Other than a few weeks immediately preceding the termination hearing, nothing in the record demonstrates that Alaina was capable of prolonged positive progress. By routinely failing to respond to visitation agencies and her case managers, she demonstrated a lack of motivation to do the bare minimum of what was required. And although DHHS offered her bus passes, gas vouchers, transportation services, drug testing, family support services, visitation services, and therapy, she believed DHHS did not provide her with adequate assistance. Further, her failure to understand the necessity of these services demonstrated an inability to comprehend her own deficiencies.

Beyond her lack of cooperation with DHHS, Alaina also displayed worrying behaviors that could have put the children at risk if they resided with her. Although she never conclusively tested positive for drugs, she tested presumptive positive for methamphetamine multiple times. Additionally, during two of her supervised visits in June 2023, it was reported that she used inappropriate physical discipline on the children. And in early 2024, there were two incidents involving law enforcement where it was reported that she destroyed someone else's property at the homeless shelter and punched a vehicle while drunk. These incidents raise obvious concerns about Alaina's ability to safely and effectively parent three children.

It is further concerning that Alaina believed she did everything asked of her despite substantial evidence to the contrary. More so, she refused to take accountability for her failures and attempted to place the blame on DHHS. Her inability to recognize her own lack of effort seriously calls into question her judgment and her comprehension of what is required to effectively parent three children.

For these reasons, and because the evidence showed the children were doing well in their current placement, we conclude that the juvenile court did not err in finding it was in the children's best interests to terminate Alaina's parental rights.

CONCLUSION

We determine the court did not err in finding that Alaina was unfit and that terminating her parental rights was in the children's best interests.

AFFIRMED.